# CASES

## DECIDED IN THE

# SUPREME COURT OF GEORGIA

### AT THE

## MARCH TERM, 1903.

---

CRAWFORD *v.* THE STATE.   LASTER *v.* THE STATE.

1. Obtaining money by false statements as to title to or interest in real estate may be an offense under the Penal Code, § 670, even though the true state of the title might have been discovered by an inspection of the records in the clerk's office of the county where the land lies.
2. Silence may be a deceitful means or artful practice within the meaning of the above-cited section ; but where the defendant claims that he remained silent because he thought the person alleged to have been deceived knew the facts, such theory must be submitted to the jury where there is any evidence on which to base a charge, and could properly be submitted even though such contention only appeared from the defendant's statement.
3. Concealment of a material fact would not be an offense under that section, unless the concealment was fraudulent and intended to deceive, and was purposely resorted to as a means of obtaining money or other thing of value from a person who was actually deceived thereby.
4. Failure to grant a proper written request to charge is not cured by covering the same principle in the general charge, if it appears that other portions of the general charge detract from that part relied on as a substitute for the special request.
5. Where a defendant in his statement uses a plat, his counsel may exhibit the same to the jury and comment thereon in his argument, even though the plat be not introduced in evidence.
6. Expressions of opinion by the court as to what has been proved require the grant of a new trial.

Argued January 19, — Decided March 12, 1903.

Indictment for cheating and swindling. Before Judge Bower. City court of Bainbridge. December 12, 1902.

Laster and Crawford were convicted under an indictment charging them with the offense of cheating and swindling, for that, on the 22d day of September, 1900, they "did falsely and fraudulently represent to Chason & Reynolds, a firm composed of Thomas

Chason and J. F. Reynolds, that said Laster and Crawford were the owners of all timber on place known as the Harvey place, in said county and State, and bounded on the east by lands of Adam Rambo and Joe Collier, on the north by the lands of A. Fort and J. R. Crawford," further describing it by its western and southern boundaries, "and did thus induce said Chason and Reynolds to purchase all of said timber on said land," of a stated size, "for the sum of five hundred dollars ; when in truth and in fact two thirds of said land and said timber was not the property of said Laster and Crawford, which fact was well known to said Laster and Crawford at the time they made said representations, and by said deceitful means and artful practices did cheat and defraud said Chason and Reynolds of the sum of three hundred and fifty dollars, the value of the timber that did not belong to said Laster and Crawford, contrary to the laws of said State," etc. From the evidence it appeared that on September 22, 1900, Laster and Crawford sold to Chason & Reynolds the timber on a tract of land which, in the deed then made by them to the purchasers, was described in the same terms as in the indictment. In the preceding May, or shortly afterward, Chason approached Laster, who held a bond for title to the "Harvey place" from Crawford, and also approached Crawford, with a view to buying the timber on the tract in question, and was told that he could get it for the amount due by Laster to Crawford, which was about $750 ; and, according to the testimony of Chason, Crawford at that time represented to him that the tract contained 250 or 300 acres, also that it contained 250 or 350 acres, and Laster showed him the boundaries, but there were no further negotiations then. There was evidence that similar representations were made to Reynolds. After these representations had been made, and before the sale, there was a dispute between Crawford and Hearn, a lessee of Fort, whose property bounded the "Harvey place" on the north, as to how far south Fort's land extended, Hearn contending that it extended a certain distance south of what Crawford contended was the true line between the two tracts; but Crawford, after investigation of the matter, admitted that Hearn's contention was correct, and so stated in a communication written to Hearn in August, 1900. There was evidence that he admitted this to Laster before the sale. The land as to which the dispute arose between Crawford and

Hearn, and which Crawford afterwards admitted was a part of Fort's land, was bounded on the east by Collier's land. The "Harvey place" was bounded on the east by Rambo's land, but no part of it was bounded by Collier's land. The deed conveying the timber to Chason and Reynolds was written by Chason in the presence of Laster and Crawford, and, according to Chason's testimony, when he was about to insert the boundaries in the deed, Crawford said, "bounded on the east by Adam Rambo." Chason said, "No, that line goes back to Joe Collier's house and the Adam Rambo land as well; it runs clear up in front of Joe Collier's place." Crawford said, "Yes, that's so;" and Chason then inserted the words, "bounded on the east by lands of Adam Rambo and J. Collier, on the north by lands of A. Fort," etc. Nothing was said at that time as to the number of acres in the tract. There was evidence that Chason and Reynolds did not know at the time of the sale, but discovered afterwards, that the "Harvey place" did not extend to the boundaries pointed out by Laster on the north, and did not contain the number of acres stated, that there was a very large deficiency in the quantity of land, and that a large proportion of the timber they thought they were buying was north of the "Harvey place." The consideration paid by them was $500. Crawford, in his statement to the jury, said: "When I went to fix up the lease, Dr. Chason wrote the boundaries of the land. When he came to the eastern boundary I said, 'Adam Rambo,' as I did not know whether it went to Joe Collier's or not. Dr. Chason said he did know, and he proposed to put down Joe Collier's name. When he struck the north boundary he said, 'bounded on the north by A. Fort.' Now, because when Jeff [Laster] came out there for me to make the lease he had agreed to let Dr. Chason have all the timber on the lot his house was on, to make up for the land we had lost, and because I had told Dr. Chason I would not take less than $733, with interest, when we talked about the trade at first, and we were getting only $500, I took it that Dr. Chason knew we had lost that land; and when he and Jeff traded he got a strip of land in addition to what he was to get when we first talked. . . Nothing was said about that part, because I thought he knew about it."

Each of the defendants made a motion for a new trial, on the grounds that the verdict was contrary to law and the evidence; and that the court erred in refusing to give the jury certain in-

structions requested, and in certain rulings and charges, the nature of which is sufficiently indicated in the following opinion.

*A. L. Townsend* and *Arnold & Arnold,* for plaintiffs in error.

*Albert H. Russell, solicitor,* contra.

LAMAR, J.   The evidence and the controlling question in these two cases being the same, they were argued together in this court.

1. The sources of information as to title to land are generally matters of record, and, since a prudent man would not ordinarily rely on oral statements in respect thereto, it was at one time doubted whether obtaining money under false pretenses could be a crime, where the fraudulent representation was as to an interest in land.   It is, however, settled law in this State that such an act is a violation of the Penal Code, § 670.   *Holton* v. *State,* 109 *Ga.* 127.   It was an interest in land that was conveyed to Chason, the prosecutor; and inasmuch as the lease contained no warranty, the law implied none.   Civil Code, § 3613.   If Chason could not recover damages for breach of warranty, it does not follow that Crawford and Laster could not be criminally prosecuted; for an inability to recover on the civil side of the court would rather aggravate the offense of obtaining money under false pretenses.   But it is altogether probable that, on proper proof, the prosecutor might have been entitled to recover for deceit, under the Civil Code, § 3814.   Pleadings in such a case, however, should set out explicitly the trick or device, and the means by which the silence operated to induce the prosecutor to part with his money.

2. Since silence may be deceitful means or artful practice (*Jones* v. *State,* 97 *Ga.* 430), it would have been better for the indictment to have made some allusion to the fact that silence was one of the means by which the money was obtained.   No issue, however, was raised as to the sufficiency of the indictment, and it was probably good, under the Penal Code, § 929.   The case was presented to the jury more on the theory made by the evidence as to silence than on statements as to the ownership of the land, charged in the indictment as the misrepresentation by which the prosecutor was defrauded; the evidence related more to the innocent representations in May, as to the number of acres, than to the silence in September, when the money was obtained.   The jury were instructed that if Laster in good faith pointed out to Chason the boundaries of the land which he thought had been bargained to him by

Crawford, or if Crawford innocently made the statement in May as to the number of acres, yet if they stood silent at the time the lease was made in September and received the money, that was equivalent to a false representation made at the time that the money was paid. The indictment says nothing whatever about the quantity of the land, nor about how many acres it contained; nor was any boundary or acreage warranted. The case therefore depended largely on the effect of statements made in May, not corrected at the time the money was obtained in September. Laster had bought from Crawford all the land described in the lease, and necessarily could not have known as much about the title as the latter. Crawford admits that, after the conversation in May, he learned that a part of the Harvey place belonged to Fort, and insisted that he thought it was well known that he had conceded Fort's ownership of a part of the land leased, and supposed that for that reason Chason gave only $500 for the timber, instead of $752, first named as the price at which he would consent for the sale to be made. Laster also desired to avail himself of this defense; and we think this theory should have been submitted to the jury in both cases. The failure to do so in Laster's case would entitle him to a new trial, because there was sworn evidence on which to base such a charge to the jury. It would have been eminently proper to submit that view in Crawford's case; but, inasmuch as it has been held that the judge is not bound to submit a theory having no other basis than the statement of the defendant, a new trial would not necessarily be granted to Crawford because of the failure to charge thereon in his case.

3. The court charged the jury: " For instance, if a man makes a representation that he owns a piece of land, several months before he sold it to a party, and believed he owned it, and then afterwards, before he consummated the sale, and taking the man's money, he found that he did not own it, and did not correct it, it would be just the same as if he knew that he did not own it at the time that the representations were made. The guilt would be in his knowing it any time before he received the payment and he not correcting it." This was error, inasmuch as it omitted all reference to the question as to whether the defendants knew Chason was relying on the previous representations, and whether the silence was fraudulent and intended to deceive.

4. According to the law applicable to cheating and swindling by obtaining money under false pretenses, the knowledge of the false statement on the part of the person making it is of the very essence of the offense; and a charge which ignores so material a feature would require a new trial, unless such error was waived by the defendant, or was otherwise cured by the court.

Both defendants requested the court to charge that if "the defendant made representations that he believed to be true, and were afterwards proved untrue, you could not convict the defendant unless it appears beyond a reasonable doubt that the defendant knew his representations to be untrue." This was not given, and in a note the judge states that the necessity for knowledge of the representations being untrue was given in the general charge. There are many decisions of this court which hold that a failure to give a. request is cured by covering the same point in the general charge. But where the error is sought to be cured in this way, it must appear that there was nothing elsewhere in the general charge which detracted from that portion which is relied on as a substitute for the special request. In this case we find that the jury were incidentally instructed that the defendant must have known that the representations were false; but at the same time the judge, in making a synopsis of all the facts necessary for the State to establish, omitted therefrom any statement that the defendant must have known that the representations were untrue, and concluded by saying, "if you find these facts, it would be your duty to convict." We think that the failure to charge as requested was not cured by a general charge wherein, at one time, the jury was instructed that knowledge of the falseness of the representations was necessary, and, at another, instructed that it was their "duty to convict" if certain facts were proved, omitting therefrom the requirement on the part of the prosecution to prove that Crawford knew that his statement was untrue. "A specific charge which is legal and adjusted to a distinct matter in issue, . . and which ·may materially aid the jury, should be given as requested, although in principle and in more general and abstract terms it may be covered by other instructions given by the court." *Metropolitan R. Co.* v. *Johnson*, 90 *Ga.* 501 (5); *Thompson* v. *Thompson*, 70 *Ga.* 692 (2); *East Tenn. R. Co.* v. *Smith*, 91 *Ga.* 176; *Belt* v. *State*, 103 *Ga.* 12 (4); *Snowden* v. *Waterman*, 105 *Ga.* 385 (5); *Roberts* v. *State*, 114 *Ga.* 450.

5. The defendant Crawford made his statement and referred to a plat which he then held in his hand. In argument before the jury his counsel sought to use this plat by way of illustration, and for the purpose of explaining his contention. This the court prohibited. While the defendant's statement is not evidence, it is the nearest approach to evidence which the law will allow him to make. He can not, for the purpose of obtaining the conclusion, indirectly introduce that which is technically evidence; he can not, by making a diagram while on the stand, give it the same position in the case as other plats which have been regularly proved, and which the jury would be allowed to take to their room for inspection, along with other documentary evidence. But if, while on the stand, he should, as is so often done, point to various parts of the room, and thereby illustrate the relative position of parties, or the relative course of lines, or thus roughly describe the boundary of land, his counsel would unquestionably have the right in his argument to the jury to repeat these statements, and to point to the lines in the room indicated by the previous statement of the defendant. So, too, if, because of the complication of the lines and positions, the defendant, while on the stand, found it clearer to make a rough drawing than to attempt an explanation solely by word of mouth, this drawing could be referred to in argument. The plat or drawing was no more evidence than was the statement of the defendant, but it was as much so, and his counsel would have as much right to use the one as the language of the other. And if, instead of making a drawing itself, the defendant should use a drawing already made, to assist in illustrating his statement and making clear to the jury what he means, his counsel would have the same right to use it in his argument. But the correctness of such diagrams and plats not being vouched for by sworn testimony, and the same not being proved by the oath of a witness, and not having been introduced in evidence, they could not be sent out with the jury along with the other documentary evidence.

6. In his charge the court said, "Look to the evidence to see whether Chason was deceived at the time he paid the money in September," and again, "If you believe from the evidence that the defendant, at the time he showed the land and timber and represented that the land belonged to Mr. Crawford, did not know any better," etc., and again, "It must appear that defendant knew, be-

fore he consummated the trade and received the money, that Crawford did not own the land." In these sentences the court expressed an opinion that money had been paid in September, that the defendant showed the land and timber and represented that the land belonged to Crawford, and that defendant " consummated the trade and received the money." The Civil Code, § 4334, requires a new trial.     *Judgment reversed. By five Justices.*